**Wesley Graham LILLY, Appellee,**

v.

**Clara SCOTT and William B. Scott, Jr., Appellants.**

No. 50531.

Court of Appeals of Oklahoma, Division No. 2.

May 22, 1979.

Rehearing Denied June 12, 1979.

Certiorari Denied July 20, 1979.

Released for Publication by Order of Court of Appeals July 26, 1979.

Rick J. Romano, Oklahoma City, for appellee.

Jack S. Dawson, Oklahoma City, for appellants.

BRIGHTMIRE, Judge.

Plaintiff, Wesley Lilly, was injured when, during a driving rainstorm, his pickup truck was struck in the rear end by defendant William Scott's car as Lilly was prepared to turn left at a major Oklahoma City intersection. From a judgment entered on a verdict for plaintiff defendant appeals complaining that the verdict resulted from the jury being informed by plaintiff of defendant's insurance coverage, and from the court's refusal to give certain instructions requested by defendant.

I

In his petition, Lilly blamed the collision on certain specified wrongful acts of defendant. Defendant's answer contained a general denial and no other defense. A pretrial conference record recited that defendant's only defense was a "general denial" and that the court allowed defendant to file a cross petition in the amount of $820.57 property damage and plaintiff to "amend to plead last clear chance." Two days later, defendant filed a cross petition blaming the wreck on plaintiff for several specified reasons. Plaintiff filed a "reply" to it in which he merely denied the cross petition allegations, and also filed an amendment to his petition which, however, did not plead last clear chance, but only another act of carelessness.

The cause, on November 8, 1976, went to trial on the issues thus formed. At the conclusion of the evidence a series of instructions were given to the jury which included a definition of "contributory negligence." With reference to the issues in the case, the court told the jury of specific claims of negligence made by plaintiff against defendant, those made by defendant against plaintiff, and the factual elements each must prove to recover. Following this the court instructed on comparative negligence. In doing so the trial court evidently treated defendant's cross petition as a defensive plea of contributory negligence.

The jury returned a verdict in which it found plaintiff's contributory negligence to be 25 percent, the negligence of defendant 75 percent and the plaintiff's total damages to be $3,467.52. The trial judge gave plaintiff a judgment for 75 percent and so far as we can see no disposition was made of defendant's cross petition.[1]

II

Defendant's first argument is that the court failed to instruct the jury on his theory of the case—a theory embodied in three requested instructions the trial judge refused to give. The first one is that a motorist driving down the street is not bound to anticipate another motorist's negligence but

---

1. Under the pleadings in this case we are at a loss to understand why the trial court instructed on comparative negligence. Neither party pleaded contributory negligence as a defense and as matters stood at the close of the evidence the jury should have been given three options (1) to return a verdict for plaintiff on his petition for up to $22,687.52 against defendant and against defendant on his cross petition; (2) to return a verdict for defendant for up to $820.57 on his cross petition and against plaintiff on his petition, or (3) to return a verdict in favor of plaintiff for up to $22,687.52 on his petition and for defendant up to $820.57 on his cross petition.

The statute establishing comparative negligence—23 O.S.Supp. 1973, § 11—merely modified the defense of contributory negligence substantively and did not create a procedural imperative to be followed in every negligence case regardless of issues raised by the pleadings.

In this case it looks like the jury found a way to exercise the third option because 25 percent of $3,467.52 is $866.88 and this is just a little more than what the defendant asked for. Plaintiff did not file a cross appeal complaining of the irregularity, and presumably is satisfied with the $2,600 judgment he has.

may assume other drivers will obey the law. The second and third instructions requested relate to the effect of a sudden emergency of a motorist driving down the highway.

■ The trial court committed no error in refusing to give any of the three requested instructions. The first, while it makes a logically correct legal observation, does not describe a theory of either a pleaded defense to plaintiff's action or of a cause of action defendant asserted against plaintiff in his cross petition. Its thrust is mainly in the nature of a judicial comment or argument which defendant presumably thought would be favorable to him. Certainly it was not necessary for the jury to be told of what a motorist may assume in order to resolve the factual issues presented to them.

■ Nor did the court err in declining to give the other two requested instructions relating to sudden emergency. Oklahoma, of course, recognizes the doctrine of "sudden emergency," or "sudden peril" as it has been called, and it has been, on occasion, referred by the high court as a separate "defense" available to a defendant—a view taken by only a minority of jurisdictions. Most states regard the occurrence of a sudden emergency as a circumstance to be considered by the fact finders in determining what due care amounts to in a given situation.[2] It is especially difficult to reconcile Oklahoma's apparent acceptance of the separate defense concept with its contemporaneous adherence to the majority view regarding contributory negligence, namely, that an emergency situation is a standard of conduct modifying circumstance equally available to ameliorate the effects of what otherwise would be considered poor judgment on the part of a plaintiff charged with contributory negligence. *Whitworth v. Riley,* 132 Okl. 72, 269 P. 350, 59 A.L.R. 584 (1928).

Because, however, existence of an emergency situation is in this state a separate pleadable defense defendant was obliged to both plead the existence of such condition and to prove he did not contribute to its creation. *Vaughn v. Baxter,* Okl., 488 P.2d 1234 (1971). The fatal fact is that defendant not only failed to plead the defense, but he did not prove it. For it can hardly be said he did not contribute to the production of the emergency in the face of an admission that he traveled across a busy, controlled intersection doing at least 50 miles per hour in a heavy rainstorm, without lights on, before striking the rear end of plaintiff's three-quarter ton pickup truck hard enough to force it to skid 50 feet.

### III

The second proposition advanced by defendant is plaintiff's injection of the forbidden subject of insurance. The hypostasis for the complaint is the following colloquy between plaintiff and his cross examiner:

"The first professional man that you saw after this accident was your attorney, was it not, sir?" Defense counsel asked plaintiff, "Didn't you go see your lawyer first before you ever contacted a doctor?"

"I didn't go see my lawyer until after I got the letters from the insurance company."

"Did you go to see your lawyers first? I'm not talking about any letters from your insurance company. I'm talking about didn't you go to see your lawyer before you went to see a doctor?"

"Counselor, I don't—if I did, I don't remember. Now, the only thing when I went to see my lawyer is when I was—I got the letters from the insurance company and they told me what they were going to do and what they were [not] going to do, so I needed help."

At this point defense counsel obtained leave to approach the bench where he moved for a mistrial "based upon the testimony of this witness that he just gave about the insurance company." The motion was overruled.

"Mr. Lilly, maybe this will help your memory. Who sent you to see Dr. Freede?

2. *Simpson v. Brand,* 108 Ga.App. 393, 133 S.E.2d 393 (1963); *Bennett v. Robertson,* 107 Vt. 202, 177 A. 625, 98 A.L.R. 152 (1935); *St.* *Johnsbury Trucking Co., v. Rollins,* 145 Me. 217, 74 A.2d 465 (1950), 21 A.L.R.2d 88 (1950), Restatement, Torts 2d § 296(1).

Mr. Lilly, wasn't it Mr. Romano that [is] sitting right here. (pointing) Isn't he the man who told you to go see Dr. Freede?"

"He told me I should see a doctor."

"Did he tell you which one?"

"I asked him which one was a good doctor, being my attorney I took his advice."

"He told you to go see Dr. Freede."

"He called some other doctor and he couldn't get him. He wasn't there. And they was the only ones that would take me right then."

"Didn't Dr. Freede send your bills to your lawyers?"

"Yes."

"That's all."

■ Counsel candidly admits in his brief that with this line of questioning he "was attempting to show that plaintiff's medical problems were either manufactured or nurtured by the lawyer." Translated that means defense counsel was trying to impart to the jury an implication not only that plaintiff was lying about his injuries—a permissible objective—but that he was doing so at the behest of his attorney—an impermissible goal. The cross examiner's attack on counsel was highly improper. To assault plaintiff's credibility and attempt to impeach his testimony regarding his injuries was appropriate. But to attack his lawyer and to him impute the serious crime of suborning perjury is to inject a collateral matter far more prejudicial than the mere matter of mentioning the sacrosanct word "insurance."[3] Especially is this true where, as here, the only basis for the attempted implication is that the lawyer sent his client to some particular physician. There are, of course, several legitimate reasons a lawyer might refer an injured client to a certain physician the most common one being to obtain medical information about the client and his alleged injury that the lawyer feels he can depend upon as being correct and truthful. Presumably this is the same reason defense lawyers usually insist on having a particular physician ex-

amine plaintiffs. And though it is common practice for plaintiff's attorney to try and impugn the truthfulness of a defense physician's testimony the act of imputing perjury of the witness to defense counsel during trial is neither customary nor one franchised by the courts.

■ The record here discloses that the word "insurance" was mentioned in response to an improper question posed by defense counsel concerning when plaintiff first saw his lawyers. The response—that plaintiff did not see his lawyer until after he "got the letters from the insurance company"—did not inform the jury that defendant was covered with liability insurance, but only that plaintiff got some letters from an insurance company. The statement furnished no clue as to whose insurance carrier sent the letters. It could have been plaintiff's, defendant's, or, less likely, someone else's.

The cross examiner voiced no objection to the answer either on the ground of unresponsiveness, or that it introduced the subject of insurance. He neither moved for a mistrial nor asked the court to strike the response or admonish the jury to ignore the answer. Instead the lawyer took up pursuit of the same improper objective and decided that he too would discuss insurance by pretending he knew plaintiff had referred to letters from his own insurance company and, so, to the jury, the defense lawyer stated that to be a fact. This, of course, was strategically dangerous because it pushed the door to the collateral subject open wide enough to justify a corrective statement by the witness about whose carrier it in fact was that sent the epistle. As it was plaintiff's response did not go this far and actually did little more than repeat his original comment. For this reason we are inclined to think plaintiff was mainly concerned with getting across why he went to his lawyer rather than with trying to let the jury know defendant had insurance coverage. Had the latter been the objective, then it seems that plaintiff's natural re-

---

**3.** Improper questions having for their only purpose the casting of reflections upon the character of witnesses is prejudicial conduct. *Horany*

*v. Paris,* Okl., 369 P.2d 636 (1962). This rule, a fortiori, should also shield lawyers from abuse.

sponse would have been to say bluntly that the letters were not from his (plaintiff's) insurance company, but defendant's. And if he had said this, a more difficult question would have been presented for resolution.

Defendant argues that the supreme court of this state "has not allowed litigants to even suggest the existence of insurance" and for this conclusion cites *Matchen v. McGahey,* Okl., 455 P.2d 52 (1969); *Million v. Rahhal,* Okl., 417 P.2d 298 (1966); *J. C. Penney v. Barrientez,* Okl., 411 P.2d 841 (1965). The conclusion is not exactly correct and the cases cited are inapposite factually. In *Matchen,* a lawyer, during argument, told the jury it need not concern itself with the collectability of any judgment rendered. The facts in *Million* consisted of a plaintiff telling the jury he had no liability insurance. In *J. C. Penney* a plaintiff mentioned insurance but the recorded circumstances involved are not disclosed in the opinion.

Somewhat more relevant to the operative facts here is the approach taken in *Hutton v. Lowry,* Okl., 444 P.2d 812 (1968). There plaintiff's medical witness during cross examination was asked if he sent plaintiff to another physician. Said the witness ". . . I can't recall whether I did or the insurance company, but we sent her over." Defense counsel did not then object. Later in the trial, however, defendant moved for a mistrial because of the answer and it was denied. In affirming plaintiff's judgment the court acknowledged the erstwhile existence of a judicial assumption in this state that "knowledge of insurance coverage will cause a jury to render a larger verdict, and in some cases render a verdict in favor of plaintiff when otherwise it would not . . .," and that this is, in effect, another way of saying that "prejudice results when the jury knows that an insurance company will pay the judgment." *Hutton,* however, points to a retreat from, or at least a qualification of the assumption in *Oklahoma Transportation Co. v. Claiborn,* Okl., 434 P.2d 299 (1967) holding that reference to defendant's insurance at trial "is harmless unless the defendant's rights are prejudiced thereby." Whether such prejudice has occurred, continued the court, "de-pends essentially upon the facts and circumstances of each case." One example of harmless reference to insurance, says the court—and one applicable here—is where there exists uncertainty as to whether or not a reference to insurance is to some type other than liability, or whether it is to plaintiff's or defendant's insurance.

The record here discloses several reasons why defendant's contention is without merit. First, he failed to make timely objection to the insurance reference. Second, he elected to discuss insurance himself thus inviting further error or at least condoning introduction of the subject. Third, no prejudice can be said to have been inflicted on defendant because of the uncertainty of what kind of insurance was involved or who the insured was, coupled with the fact that defendant does not complain that the verdict is excessive—which, after all, is the ultimate consequence of judicially assumed prejudice.

As an incidental observation it occurs to us that the verdict's size completely negates the notion that insurance affected its birth because it was considerably less than $5,000 —a figure most people know to be a minimum limit of liability coverage. Moreover, whatever validity the judicial assumption regarding insurance may have had in the distant past when economic conditions were vastly different, would seem to have vanished with the advent of widespread affluency, compulsory motor vehicle liability insurance laws, and a generally more stable and objective juror sitting on juries, most of whom assume—and justifiably so—that whenever a substantial amount of money is sought from a defendant of apparently ordinary means, he is covered with insurance.

The judgment appealed is not the product of reversible error and is therefore affirmed.

BACON, P. J., and NEPTUNE, J., concur.